**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | § | |
| SLAV LIGAI and TATIANA LIGAI, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-11-2973 |
| | § | |
| ETS-LINDGREN INC., | § | |
| and ESCO TECHNOLOGIES, INC., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Slav Ligai and his wife, Tatiana Ligai, worked at ETS-Lindgren Inc. (ETS) from 2005 until their employment was terminated.  Slav Ligai worked as a Calibration Technician in ETS's Calibration Laboratory until February 2013.  Tatiana Ligai was a Test Technician in a different laboratory until May 2012.  Slav Ligai alleges that ETS and its parent company, ESCO, Inc., violated the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, by submitting claims for payment for improperly conducted calibration tests and equipment adjustments under contracts with federal government agencies, including the Department of Defense.  Ligai alleges that ETS and ESCO falsely certified that the equipment was calibrated in conformance to applicable specifications and standards.  (Docket Entry No. 20, Second Am. Compl., "SAC," ¶¶ 124-131).  Both plaintiffs allege that they were fired in retaliation for Slav Ligai's internal complaints about the calibration errors.  Slav Ligai filed this suit under seal in 2011.  When the United States declined to intervene in 2013, Slav Ligai filed a Second Amended Complaint in which Tatiana Ligai appeared for the first time as a plaintiff.

ETS and ESCO have separately moved to dismiss the Second Amended Complaint. (Docket Entries No. 35, 40).  The plaintiffs responded, (Docket Entry No. 46), and the defendants filed separate replies, (Docket Entries No. 50, 51).

Based on the pleadings; the motions, responses, and replies; the record; and the applicable law, this court grants ETS's and ESCO's motion to dismiss the FCA claims, the conspiracy claims, the common-law claims, and the retaliation claims.  All but the retaliation claims are dismissed with prejudice.  The plaintiffs have already amended three times and there is no basis to find that an additional amendment would cure the pleading deficiencies, making another amendment futile.  Leave to amend is granted only as to the retaliation claims.  Any amended complaint asserting the retaliation claims must be filed no later than October 17, 2014.

The reasons for these rulings are explained below.

## I.     Background

### A.     The Parties

#### 1.     The Plaintiffs

Slav Ligai describes himself as an "engineer with vast experience in the field of radio frequency (RF) equipment calibration."  (Docket Entry No. 20, SAC ¶ 9) (quotations omitted). After working in Russia from 1979 to 1996, he moved to the United States.  (*Id.*).  As a Calibration Technician in ETS's Calibration Laboratory, he worked on a range of instruments, including antennas, field probes, and line-impedance stabilization networks (LISNs).  (*Id.*). Tatiana Ligai worked as an Elecro-Mechanical Assembler in the ETS Electronics Department, then as a Test Technician in the CTIA Laboratory.  (*Id.* ¶ 10).

#### 2.     ETS-Lindgren and ESCO

ETS is a technology company that "specializes in the development of systems and instrumentation designed to 'measure, shield, and control electromagnetic energy. . . .'" (Docket Entry No. 40 at 12) (quoting Docket Entry No. 20, SAC ¶ 5).  As part of its business, ETS operates a commercial Calibration Laboratory at which it calibrates instruments for private and public clients, including United States government and military clients.  (*Id*.).  The Laboratory is accredited by the American Association for Laboratory Accreditation ("A2LA").  (*Id*.).

ESCO is ETS's parent company.

**B.    The Facts Alleged in the Second Amended Complaint**

Ligai alleges that ETS submitted thousands of claims for payment to its government, military, and government-contractor clients for calibration work relating to six different types of equipment:

    (1)      Rod Antennas (Docket Entry No. 20, SAC ¶¶ 47-66);

    (2)      Electrical Field Probes (*id*. ¶¶ 67-79);

    (3)      Broadband Antennas (*id*. ¶¶ 87-93);

    (4)      Current Probes (*id*. ¶¶ 94-100);

    (5)      Magnetic Loop Antennas (*id*. ¶¶ 80-86); and

    (6)      Line Impedance Stabilization Networks (*id*. ¶¶ 101-107).

Ligai alleges that ETS's claims were false because they were for calibration tests using equipment that did not conform to industry standards and specifications and falsely certified compliance with them.  He also alleges that the government requires laboratories performing calibration testing for the military and other government agencies to be A2LA-accredited laboratories, and that ETS was falsely certifying compliance with the A2LA accreditation standards.  (*Id*. ¶¶ 12, 30, 31, 32, 39).

In addition to false claims for the six different categories of instruments, Ligai also alleges fifteen additional types of false claims.  (*Id.* ¶ 108).  A spreadsheet describes 295 service-work orders for the government and another 3,811 for government contractors.  (*Id.* ¶ 109, Ex. 24).  As ETS points out, many of the contractors listed appear to be private commercial entities. (Docket Entry No. 40 at 16).

Ligai alleges that companies that provide calibrated equipment or calibration services to military or federal government agencies must certify compliance with the following standards, when applicable:

- military specifications for calibration;

- standards set by the SAE International Technical Standards Board for calibration, incorporated into the military standards;

- American National Standards Institute (ANSI) standards for calibrating antennas,  LISNs, and clamps;

- Institute of Electrical and Electronics Engineers, Inc. (IEEE) standards for calibrating field sensors and probes;

- International Organization for Standardization (ISO) and International Electrotechnical Commission (IEC) standards for a calibration laboratory; and

- American Association for Laboratory Accreditation (A2LA) standards, which include the standards set out above.

(Docket Entry No. 20, SAC ¶¶ 17-33).

The Second Amended Complaint identifies MIL-STD-461F[1] and certain industry standards incorporated into it, such as the SAE ARP-958-2003[2] standard.  The Complaint also identifies the ANSI C63.5-2003[3] standard, the IEEE 1309-2005[4] standard, and the ISO/IEC 17025[5] standard as applicable.  Ligai alleges that adherence to, and certification of compliance with, each applicable standard was a condition of paying ETS imposed by ETS's government, military, and government-contractor clients.  (*Id.* ¶¶ 20-31).

The alleged false claims for the six different equipment types are described below.

### 1.     *Claim 1 – Rod Antennas Calibrated for the Navy*

In December 28, 2006, ETS sold a model 3301B Rod Antenna to the Navy and issued a Certificate of Conformance.  (*Id.*, Ex. 1).  A Rod Antenna, often referred to as a monopole

---

[1] The MIL-STD-461F is a standard establishing interface and associated verification requirements for the control of the electromagnetic interference (EMI) emissions and susceptibility characteristics of electronic, electrical, and electro-mechanical equipment and subsystems designed or procured for use by activities and agencies of the Department of Defense (DoD).  *See* Dep't of Defense Interface Standard, "Requirements for the Control of Electromagnetic Interference Characteristics of Subsystems and Equipment," *available at* http://www.dtbtest.com/PDFs/MIL-STD-461F.pdf, at 1 (Dec. 10, 2007).

[2] Aerospace Recommended Practice for Electromagnetic Interference Measurement Antennas; Standard Calibration Method ("SAE AR-958").

[3] American National Standard for Electromagnetic Compatibility - Radiated Emission Measurements in Electromagnetic Interference (EMI) Control - Calibration of Antennas (9KHz to 40 GHz) ("ANSI C63.5-2006").

[4] IEEE Standard for Calibration of Electromagnetic Field Sensors and Probes, Excluding Antennas, from 9KHz to 40 GHz ("IEEE 1309-2005").  IEEE Standards documents are developed within the IEEE Societies and the Standards Coordinating committees of the IEEE Standards Association (IEEE-SA) Standards Board. The IEEE develops its standards through a consensus development process, approved by the American National Standards Institute, which brings together volunteers representing varied viewpoints and interests to achieve the final product. Volunteers are not necessarily members of the Institute and serve without compensation. While the IEEE administers the process and establishes rules that promote fairness in the consensus development process, the IEEE does not independently evaluate, test, or verify the accuracy of any of the information contained in its standards.  *See* IEEE Standard for Calibration of Electromagnetic Field Sensors and Probes, Excluding Antennas, from 9 kHz to 40 GHz, Approved 9 June 2005, The Institute of Electrical and Electronics Engineers, Inc., *available at* http://www.docin.com/p-115728585.html.

[5] The International Electrotechnical Commission (IEC) is the world's leading organization that prepares and publishes International Standards for all electrical, electronic and related technologies.  *See* International Electrotechnical Commission, "About the IEC," http://www.iec.ch/about/?ref=menu (last visited Sept. 11, 2014).

antenna, is used to broadcast high-frequency radio signals and is a component of mobile and internet networks.

Ligai claims that the 2006 Certificate of Conformance submitted to the Navy also certified that ETS's "Calibration Laboratory and Quality Systems controls [were] compliant with ISO/IEC 17025-2005.6."[6]  (*Id.*, SAC  ¶ 49 & Ex. 1).  Two years later, the Navy returned the same Rod Antenna to ETS for routine calibration.  ETS then issued a second Certificate of Calibration Conformance, again certifying that the Rod Antenna had been calibrated in compliance with SAE ARP-958-2003, ANSI 63.5-2006,[7] and ISO/IEC 17025-2005.  (*Id.*, SAC ¶¶ 51-52 & Ex. 3).

The 2008 Certificate stated that the Rod Antenna had an Antenna Factor of 5.2 decibels (dB), with a calibration certainty of +/- 0.3 dB, and that the "Calibration Laboratory and Quality Systems controls" were compliant with ISO/IEC 17025-2005.  (*Id.*, SAC ¶¶  50-51 & Ex. 3). Ligai claims that the Antenna Factor in 2008 should have been within +/- 0.3dB of the certified Antenna Factor in 2006—between 4.9 dB and 5.5 dB.  (*Id.* ¶ 50).  According to Ligai, both the 2006 and 2008 Certificates were inaccurate because the Rod Antenna had not been calibrated in compliance with SAE ARP-958-2003 or ANSI 63.5-2006.  (*Id.* ¶ 52).  Ligai alleges that the calibration certainty was "at least [+/-]3.7 dB (and possibly as high as [+/-]16dB), and not +/-0.3 dB as certified."  (*Id.*).

**2.     *Claim 2 – Rod Antennas Calibrated for NASA***

---

[6] ISO/IEC 17025-2005 specifies the general requirements for the competence to carry out tests or calibrations, including sampling. It covers testing and calibration performed using standard methods, nonstandard methods, and laboratory-developed methods.  *See* http://www.iso.org/iso/catalogue_detail.htm?csnumber=39883.

[7] ANSI 63.5-2006 illustrates a method for the checkout and calibration of electromagnetic interference measurement antennas.  *See* http://infostore.saiglobal.com/store/details.aspx?ProductID=845929.

On December 19, 2007, ETS received payment for calibrating a Rod Antenna for NASA. Ligai performed the first calibration.  (*Id.*, SAC ¶ 57 & Ex. 4).  ETS issued a Certificate of Calibration Conformance that certified compliance with SAE ARP-958-2003, ANSI 63.5-2006, and ISO/IEC 17025-2005.  (*Id.*).  Ligai alleges that the calibration was inaccurate and that ETS was aware of a "3 dB discrepancy."  (*Id.* ¶ 62).  Ligai alleges that ETS later made corrections and fixed "design defect[s]" in the calibration block, but the calibration methods remained unreliable.  (*Id.* ¶¶ 61, 63-65).

### 3.   *Claim 3 – Electrical Field Probe Calibration for the Air Force*

In July 2007, ETS contracted with the Air Force to calibrate an HI-6005 Electric Field Probe.  Field Probes are designed to intercept and read radio data over a large range of signals. Ligai claims that ETS provided the Air Force with "materially false and fraudulent certifications" resulting from "defective instruments for probe calibrations, direct and indirect standard violations, software processing errors, design defects, incorrect testing setups, and bogus uncertainty analysis."  (*Id.* ¶¶ 67-73).

### 4.   *Claim 4 – Electrical Field Probe Calibration for the Army*

Ligai alleges that in June 2008, ETS improperly calibrated an Electrical Field Probe and falsely certified that it was in compliance with IEEE 1309-2005 and ISO/IEC 17025-2005.  Ligai alleges that the calibration error stems from the same factors affecting the Field Probe calibrated for the Air Force.  (*Id.* ¶¶ 74-77).

### 5.   *Claim 5 – Magnetic Loop Antennas*

Ligai alleges that on August 31, 2006, ETS issued the FCC a materially false calibration certificate for a Magnetic Loop Antenna that was not compliant with ISO/IEC 17025-2005 and IEEE 291-1992.  (*Id.*, SAC ¶¶ 81-82 & Ex. 11).  Ligai issued the certification himself.  (*Id.*, Ex.

11).  He alleges that "[a]t or around 2006," he discovered "significant deviations in data when different cables were used in the calibration setup" and "confirmed significant calibration errors due to a variety of systematic problems. . . ."  (*Id*., SAC ¶ 84).

### 6.      *Claim 6 – Broadband Antennas Calibrated for the Navy*

Ligai alleges that in September 2008, ETS issued the Navy a materially false calibration certificate for a Broadband Antenna that was not compliant with SAE ARP-958-2003 or ISO/IEC 17025-2005.  (*Id*., SAC ¶ 88 & Ex. 12).  Ligai alleges that ETS ignored faulty testing conditions at the Open Antenna Test Site.  He filed a report informing his superiors of the calibration testing problem, but received no response.  (*Id*., SAC ¶ 92).

### 7.      *Claim 7 – Current Probes Calibrated for Raytheon*

Ligai alleges that on April 4, 2007, ETS issued Raytheon (a government defense contractor) a materially false calibration certificate for a Current Probe that was not compliant with ANSI 63.4-2003 or ISO/IEC 17025-2005, as certified.  (*Id*., SAC ¶¶ 96-98 & Ex. 14).  A Current Probe is a type of electronic test instrument that allows observation of constantly varying signal voltages.  It is used for maintenance work on various kinds of electronic communications equipment.

### 8.      *Claim 8 – Line Impedance Stabilization Networks Calibration for Raytheon*

Ligai alleges that in April 2009, ETS issued six materially false calibration certificates to the Navy for LISNs, which enable emissions measurements.  Ligai alleges the LISNs that ETS calibrated for the Navy did not comply with ANSI 63.4-2003 or ISO/IEC 17025-2005, as certified.  (*Id*., SAC ¶ 102 & Ex. 17).

### C.   The Events Leading Up to This Lawsuit

Ligai alleges that from 2005 to 2013, he frequently informed his supervisors about systemic calibration problems and errors, but his reports were consistently ignored.  (*Id.* ¶¶ 15, 40).  Besides internal complaints, Ligai alleges that he privately approached the FBI and the office of the United States Attorney General about his belief that ETS was improperly calibrating the equipment it used to perform its calibration contracts for government and military clients.  The FBI suggested that Ligai collaborate with the A2LA to conduct an investigation, which Ligai did in March 2009.  (*Id.* ¶ 41).

On November 16, 2010, the A2LA audited the ETS Calibration Lab using information Ligai had provided.  (*Id.* ¶ 43).  According to Ligai, the A2LA audit confirmed 32 separate violations of standards in the ETS Calibration Laboratory.  (*Id.*).  Ligai does not allege, however, that this resulted in the revocation or suspension of ETS's A2LA accreditation.  Instead, Ligai alleges that the A2LA's president informed him that his allegations were "beyond A2LA's scope of responsibility."  (*Id.* ¶ 45).  ETS retained its A2LA accreditation.

Ligai filed this action under the Federal False Claims Act in a sealed complaint on August 10, 2011.  (*Id.* ¶ 45).  The government declined to intervene on April 17, 2013, and this court lifted the seal on April 22, 2013.

In May 2012, Tatiana Ligai was fired from her job.  She alleges that it was in retaliation for Slav Ligai's whistleblowing activities.  (*Id.* ¶¶ 129, 164-165).  Slav Ligai was fired in February 2013.  He alleges that it was in retaliation "for his refusal to remain silent while ETS placed profits and greed above honesty and safety. . . ."  (*Id.* ¶¶ 130, 164).  Both actions occurred before his FCA suit was unsealed and revealed to the defendants.

### D.     The Causes of Action Alleged in the Second Amended Complaint

#### 1.     The False Claims Act Fraudulent Statement Causes of Action

In Count I of the Second Amended Complaint, Ligai alleges that ETS and ESCO made false claims for payment to the government, violating the FCA, 31 U.S.C. § 3729(a)(1)(A). He alleges that the claims included false certifications that the products calibrated, as well as the instruments and laboratory used to calibrate them, "satisfied military and government contract specifications and mandatory government and military quality control specifications, when they did not." (Docket Entry No. 20, SAC ¶ 12). Ligai alleges that "[e]ach certification was material to the government's decision to pay ETS for the instrument or service certified." (*Id*.). Ligai seeks damages "resulting from inaccurate calibration of specific instruments by ETS" exceeding $55 million and perhaps exceeding $180 million. (*Id.* ¶ 126). He acknowledges that measuring damages is "difficult." (*Id.* ¶ 128.). He seeks damages that he alleges approximate the cost consequences of poor calibration, using a percentage of the total revenue from all sources for the government contracting agency, such as the Department of Defense. (*Id.* ¶ 128). Ligai also seeks treble damages and penalties.

Count II alleges FCA liability under 31 U.S.C. § 3729(a)(1)(B) for "knowingly making and using or causing to be made and used a false record or statement to have a false or fraudulent claim paid or approved by the United States Government. . . ." (*Id.* ¶ 139).

Count III alleges conspiracy under 31 U.S.C. § 3729(a)(1)(c) between ETS and ESCO and others. Count IV asserts a "reverse false claims" cause of action under 31 U.S.C. § 3729(a)(1)(G), alleging that the payments ETS and ESCO received were for false claims and were therefore overpayments. Ligai alleges that ETS and ESCO wrongfully retained these overpayments and have an "obligation to the United States" to return them. (*Id.* ¶ 148).

### 2.      The Common-Law Claims

In Count V of the Second Amended Complaint, Ligai alleges a claim for payment by

mistake of fact on the part of the United States.  He seeks to recover the money the government

paid the defendants.  Count VI asserts an unjust enrichment claim, alleging that the United States

paid ETS and ESCO "under circumstances dictating that, in equity and good conscience, the

money should be returned to the United States."  (*Id*. ¶ 162).

### 3.      The False Claims Act Retaliation Causes of Action

Count VII alleges that both Slav and Tatiana Ligai were "discharged, demoted,

threatened,

harassed, and otherwise discriminated against in the terms and conditions of their employment,"

in retaliation for Slav Ligai's efforts to stop the defendants from submitting fraudulent claims to

the United States for payment.  (*Id*. ¶¶ 164-65).

### E.      The Motions to Dismiss

ESCO and ETS each moved to dismiss the Second Amended Complaint under Rule 9(b)

and Rule 12(b)(6).  (Docket Entries No. 35, 40).  Ligai responded, and the defendants each

replied.  (Docket Entries Nos. 46, 50, and 51).  The arguments and responses are analyzed

below.

## II.     The Applicable Legal Standards

### A.      Rule 12(b)(6)

A complaint may be dismissed when the plaintiff fails "to state a claim upon which relief

can be granted."  Fed. R. Civ. P. 12(b)(6).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

(2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 677-80 (2009), the Supreme Court confirmed that

Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint must contain enough factual allegations "to state a claim to relief that is plausible on its face" to withstand a Rule 12(b)(6) motion.  *Iqbal*, 556 U.S. at 678 (quotations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Facial plausibility "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Nor is facial plausibility "akin to a 'probability requirement;'" rather, "it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

### B.     Rule 9(b)

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other condition of mind of a person may be alleged generally."  *Id.*  Although the particularity Rule 9(b) demands differs with each case, "a plaintiff pleading fraud must set forth the who, what, when, and where before access to the discovery process is granted.  Anything less fails to provide defendants with adequate notice of the nature and grounds of the claim."  *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (quotations and citations omitted); *accord United States ex rel. Steury v. Cardinal Health, Inc. (Steury II)*, 735 F.3d 202, 204 (5th Cir. 2013).  Rule 9(b) has four purposes: to ensure that the defendant has sufficient information to formulate a defense by having notice of the conduct

complained of; to protect defendants against frivolous suits; to eliminate fraud actions in which all the facts are learned after discovery; and to protect defendants from undeserved harm to their goodwill and reputation.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999).  Rule 9(b) must be interpreted and applied in light of these purposes.

"'[C]laims brought under the FCA must comply with the particularity requirements of 9(b) for claims of fraud."  *Steury II*, 735 F.3d at 204 (quoting and altering *United States ex rel. Steury v. Cardinal Health, Inc. (Steury I)*, 625 F.3d 262, 266 (5th Cir. 2010)).  While FCA claims must comply with Rule 9(b)'s pleading requirements, "[i]n contrast to common-law fraud, the FCA "lacks the elements of reliance and damages."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 (5th Cir. 2009).  "It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim."  *Id.*  "[T]o plead with particularity the circumstances constituting fraud for a False Claims Act [§ 3729(a)(1)(A)] claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Id.* at 190.  To plead with the requisite particularity a § 3729(a)(1)(B) claim, the complaint need not "allege details of fraudulent bills actually presented to the government."  *Id.* at 192.  The relator must, however, allege facts showing that "the defendant made a false record or statement [material to] a false or fraudulent claim paid by the Government."  *Id.*; *see also* 31 U.S.C. § 3729(a)(1)(B).

The Second Amended Complaint claims are analyzed in light of the Fifth Circuit and Supreme Court case law.

## III.     Analysis

### A.      Counts I, II, and IV:  False or Fraudulent Claims Under the FCA

#### 1.      The Legal Standard for False Claims Act Liability for False or Fraudulent Claims for Payment

The FCA creates a civil cause of action for the Attorney General or a qui tam relator for government-contracting fraud.  The key provision imposes civil liability on any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B)  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. . . .

31 U.S.C § 3729(a)(1).[8]  Section 3729(a) allegations require: "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys . . . ."  *See United States ex rel. Longhi v. Lithium Power Techs., Inc*., 575 F.3d 458, 467 (5th Cir. 2009).

The FCA itself defines most of these elements and the case law explains how they are applied.  The FCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property" that "is presented to an officer, employee, or agent of the United States," or is "made to a contractor. . . if the money or property is to be spent on the

---

[8]   The FCA was amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub.L. No. 111–21, § 4, 123 Stat. 1617, 1621–25 (2009). The amendment to § 3729(a)(1) became effective on May 20, 2009. FERA, Pub.L. No. 111–21, § 4(f).  Former § 3729(a)(1) provided that any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" is liable to the United States for treble damages.  The amended version of this provision, located at § 3729(a)(1)(A), struck the phrase "to an officer or employee of the United States Government or a member of the Armed Forces of the United States." FERA, Pub.L. No. 111–21, § 4(a).  Similarly, former § 3729(a)(2) provided that any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government" is liable to the United States for treble damages. The amended version of this provision, located at § 3729(a)(1)(B), replaced "to get" with "material to" and struck the phrase "paid or approved by the Government."  FERA, Pub. L. No. 111-21, § 4(a).

Government's behalf or to advance a Government program or interest."  31 U.S.C. § 3729(b)(2).

The Supreme Court has cautioned that the FCA does not punish every type of fraud committed

on the government.  *See United States v. McNinch*, 356 U.S. 595, 599 (1958).  Liability does not

arise from underlying fraudulent activity, but from the fraudulent claim for payment.  *See United*

*States ex rel. Conner v. Salina Regional Health Ctr., Inc.*, 543 F.3d 1211, 1219 (10th Cir. 2008)

("[L]iability [under the FCA] does not arise merely because a false statement is included within a

claim, but rather the claim itself must be false or fraudulent." (quoting and altering *United States*

*ex rel. A+ Homecare, Inc. v. Medshares Mgm't Group, Inc.*, 400 F.3d 428, 443 (6th Cir. 2005)).

The statute defines "knowing" or "knowingly" to mean that, with respect to the truth or

falsity of the information underlying the claim, a person  "has actual knowledge of the

information";  "acts in deliberate ignorance of the truth or falsity of the information"; or "acts in

reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A); *Longhi,*

575 F.3d at 467 (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125

F.3d 899, 902 (5th Cir. 1997)).  "Material" is defined to mean "having a natural tendency to

influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C.

§ 3729(b)(4); *Longhi*, 575 F.3d at 469-70.  "All that is required under the test for materiality . . .

is that the false or fraudulent statements have the potential to influence the government's

decisions." *Longhi*, 575 F.3d at  470.

When the FCA claim rests on a violation of a contract, statute, or regulation, the

"linchpin" of that claim is the "requirement of a certification of compliance."  *United States ex*

*rel. Spicer v. Westbrook*, 751 F.3d 354, 365 (5th Cir. 2014).  The Fifth Circuit has "concluded

that when 'the government has conditioned payment of a claim upon a claimant's certification of

compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent

claim when he or she falsely certifies compliance with that statute or regulation." *Id.* (quoting *United States ex rel. Marcy v. Rowan Cos., Inc.*, 520 F.3d 384, 389 (5th Cir. 2008)). "'[F]alse certifications of compliance' create liability only when 'certification is a prerequisite to obtaining a government benefit.'" *Id.* (quoting *Marcy*, 520 F.3d at 389).

The requirement that the certification of compliance be a condition of payment is long-standing. "The FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts." *Steury I*, 625 F.3d at 268. The key is whether "the certification is a prerequisite to obtaining a government benefit." *Thompson*, 125 F.3d at 902; *United States ex rel. Willard v. Humana Health Plan of Texas  Inc.*, 336 F.3d 375, 382-83 (5th Cir. 2003) (upholding a district court's dismissal because the plaintiff alleged violations of HMO enrollment antidiscrimination laws but not that the U.S. agency "*conditioned its payment* . . . on any implied certification of compliance with the anti-discriminatory regulations"). A "'false certification of compliance, without more, does not give rise to a false claim for payment unless payment is conditioned on compliance.'" *Spicer*, 751 F.3d at 366 (quoting *Steury I*, 625 F.3d at 269). "[E]ven if a contractor falsely certifies compliance (implicitly or explicitly) with some statute, regulation, or contract provision, the underlying claim for payment is not 'false' within the meaning of the FCA if the contractor is not required to certify compliance in order to receive payment." *Id.* at 365 (quoting *Steury I*, 625 F.3d at 269).

The parties dispute whether Ligai alleges "legally false" or "factually false" certifications. A certification is "legally false" when a contracting party affirmatively and explicitly certifies compliance with a statute or regulation and the certification is a condition to receiving the government benefit under the contract. *See Thompson*, 125 F.3d at 902; *United States ex rel. Bennett v. Medtronic, Inc.*, 747 F.Supp. 2d 745, 765-66 (S.D. Tex. 2010).  A

16

certification is "factually false" if it "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Bennett*, 747 F. Supp. 2d at 765 (citing *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001)).  Whether Ligai's FCA false-claim cause of action is characterized as resting on a legally false or factually false theory of liability does not alter the critical analysis.[9]  When, as here, "[t]he linchpin of an FCA claim" is the false certification of compliance with a statute, regulation, or contract, the claim is actionable only when false certification of compliance is a condition of payment and is knowingly submitted.  *Spicer*, 751 F.3d at 365.  The Fifth Circuit has "repeatedly upheld the dismissal of false-certification claims (implied or express) when a contractor's compliance with federal statutes, regulations, or contract provisions was not a 'condition' or 'prerequisite' for payment under a contract."  *Steury I*, 625 F.3d at 268–69 (citing as examples *Marcy*, 520 F.3d at 389–90 (upholding dismissal); *Willard*, 336 F.3d at 381 (same); *Thompson*, 125 F.3d at 902–03 (remanding for fact determination as to whether payment was "conditioned" on certification)).

A certification may be either express or implied.  Express certification liability arises when a government payee "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."  *Mikes*, 274 F.3d at 698. Implied certification liability is based on the government's payment to a party that it would not have paid had it known that the party violated a law, regulation, or contract.  *See id.* at 699; *see also Steury I*, 625 F.3d at 268.  The theory is that the payment claim contained an implied

---

[9]  Some commentators have recognized that the distinction between factually and legally false certifications can be both blurry and unhelpful.  *See, e.g.*, *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 385-86 (1st Cir. 2011) (observing that the "distinction between factually and legally false or fraudulent claims" "may do more to obscure than clarify the issues before us").  Because Ligai fails to establish that certified compliance with a given calibration range or industry standard was a condition for payments to ETS under its government contracts, the result is the same whether the claims are characterized as legally or factually false.

certification of compliance with the law, regulation, or contract, and was therefore fraudulent. The Fifth Circuit "has not definitively ruled on the cognizability of implied false certification claims," but it has assumed that plaintiffs may advance an implied certification theory. *Steury II*, 735 F.3d at 207. Whether Ligai asserts an express or an implied false certification theory of liability, the Fifth Circuit is clear that he must specifically and sufficiently allege the statutory, regulatory, or contract requirement making certification of compliance a condition or prerequisite for the government's payment. *See Steury I*, 625 F.3d at 268; *Steury II*, 735 F.3d at 205-07.

## 2.     Certification and the Conditions-of-Payment Requirement

Ligai's Second Amended Complaint alleges four practices that violate the FCA: (1) the knowing presentment of a false claim to the government, 31 U.S.C. § 3729(a)(1)(A); (2) the knowing use of a false record or statement material to a false or fraudulent claim, *id.* § 3729(a)(1)(B); (3) the knowing use of a false record or statement material to an obligation to pay the government, *id.* § 3729(a)(1)(G); and (4) the knowing concealment or knowing and improper avoidance or decrease of an obligation to pay the government, *id.* § 3729(a)(1)(G).

ETS and ESCO argue that Ligai's FCA claims under § 3729(a)(1)(A), (B), and (G) are not actionable because while he conclusorily alleges that payment was contractually conditioned on certifying compliance with the certification standards he cites, he fails to allege any statute, regulation, or contract provision that sets out the requirement. That is, he fails to allege any specific requirement for ETS to certify compliance with the specifications or standards as a condition for payment. Because "a false certification of compliance, without more, does not give rise to a false claim for payment unless payment is conditioned on compliance," *Steury I*, 625

F.3d at 269; *Steury II*, 735 F.3d at 206 (same), Ligai must allege facts showing how payment was conditioned on ETS's certifying compliance with the calibration standards.

In *Steury I*, the relator brought an FCA claim against her former employer for making false representations about allegedly defective intravenous fluid pumps sold to hospitals operated by the Veterans Administration. Although the relator did not allege that "the particular contracts between [the defendant] and the Government impose[d] a warranty of merchantability," she alleged that certain federal regulations governing federal commercial acquisition contracts included "a warranty of merchantability and a warranty of fitness for a particular purpose." 625 F.3d at 269. Recognizing the distinction between FCA claims and breach-of-contract claims, the Fifth Circuit held that the defendant "did not make an implied certification that the [fluid] pumps complied with the warranty of merchantability simply because the Government's standard commercial-acquisition contract includes a warranty of merchantability." *Id.* at 270. The court observed that the federal regulations at issue expressly conditioned payment for commercial items on *acceptance* of the goods (rather than *compliance* with the warranty of merchantability) and provided several remedies the government could pursue (other than refusal to pay) even if it received noncompliant items. *See id.*

On remand, in *Steury II*, the relator amended her complaint to allege that the defendant's government contract "specifically required that the [fluid pumps] be merchantable." 735 F.3d at 206. The relator alleged that because the defendant's contract required the pumps to be merchantable, the claim for payment for noncompliant pumps violated the FCA. The district court granted the motion to dismiss, concluding that the relator failed to allege that the government conditioned payment for the pumps on a certification that they complied with the warranty of merchantability. The Fifth Circuit affirmed on the ground that the relator had failed

19

to identify the contract provisions requiring a certification of merchantability as a condition of payment. *Steury II*, 735 F.3d at 206. Without an allegation of a specific contractual merchantability provision that was a condition without which the government would not have paid the company, the allegation was merely a conclusion, and "simply stating the conclusion [would] not do." *Id.*

### 3.    Ligai's False Certification Claims

Ligai alleges that the calibration test results ETS reported and certified were incorrect because the instruments and laboratory used to perform the tests failed to meet certain industry specifications or standards. But, as ETS points out in its reply, the Second Amended Complaint fails to allege:  that the observed results were not recorded as observed; what provisions of the specifications or standards were violated; and what contract provisions required the certifications as a condition of payment. (*See* Docket Entry No. 50 at 16). As a result, the allegations of inaccurate calibration certifications are insufficient to state a claim for FCA liability based on false certifications. *See Steury II*, 735 F.3d at 206–207 ("These conclusory allegations do not identify the contractual provisions regarding merchantability. . . . As we have noted, an FCA relator must clearly state the substance of the fraud that has been committed; here, the essence of the fraudulent activity of implied false certification of compliance cannot be gauged unless Steury reveals how the Signature pumps deviated from the government's specifications."); *Steury I*, 625 F.3d at 269 ("[A] false certification of compliance . . . does not give rise to a false claim for payment unless payment is conditioned on compliance.").

Ligai admits that the "specific contractual text is not quoted" in the Second Amended Complaint. (Docket Entry No. 46, at 10). Instead, he asks this court to infer the existence of one or more contracts that required certification as a material factor in the government's decisions to

pay and therefore as a condition for payment.  (*See id.* at 13).  *Steury II* and *Spicer* make clear that

such an inference is insufficient.  In *Steury II*, the court held that alleging the contract provision

requiring certification as a prerequisite to payment was an essential element of an FCA claim.

735 F.2d at 206-07.  In *Spicer*,  the Fifth Circuit recently explained and emphasized that the

"'prerequisite requirement has to do with more than just the materiality of a false certification; it

ultimately has to do with whether it is fair to find a false certification or false claim for payment

in the first place.'"  *Spicer*, 751 F.3d at 366 (quoting *Steury I*, 625 F.3d at 269).

Ligai's allegations of false certifications of correct calibrations, and the allegation that the

government would not have paid if it had known that the calibrations were incorrect, is deficient

under Rule 9(b) and Rule 12(b)(6).  Ligai has not alleged or in his voluminous briefing identified

the contract or other provisions requiring ETS to certify compliance with the calibration standards

as a condition for payment.[10]

### 4.    Ligai's Condition-of-Participation Argument

Ligai appears to allege that ETS's A2LA accreditation is a "condition of participation" in

government contracts and that adherence to A2LA standards is therefore a condition of payment

by the government.  (*See* Docket Entry No. 20, SAC ¶¶ 31 ("The DoD and other government

organizations require laboratories performing EMC calibration for the military and other

government agencies to be accredited laboratories which satisfy the ISO/IEC 17025 standard."),

---

[10] Ligai's argument that the calibration services ETS provided for the government "were subject to 'higher-level contract quality requirements'" under the federal acquisition regulations, (Docket Entry No. 46, at 11 (citing and quoting 48 C.F.R. §§ 46.202-4, 46.311 & 52.246-11)), fails for similar reasons.  The regulations Ligai cites mention some of the standards identified in ETS's certifications of compliance as "[e]xamples" of "higher-level quality standards," but these regulations are not self-enforcing and impose no independent condition of payment.  Rather, the cited regulations encourage the government's "contracting officer" to use certain boilerplate contractual language to ensure compliance with these standards when "the technical requirements of the contract" require "advanced metrology."  48 C.F.R. § 46.202-4.  Because Ligai does not point to any specific contractual provision requiring ETS's compliance with these standards as a condition of payment from the government, he fails to state a claim.

32 ("All testing laboratories seeking A2LA accreditation must comply with the ISO/IEC 17025 standard or other applicable governmental and military specifications . . . .")).  Ligai appears to argue that evidence that ETS failed to adhere to A2LA standards shows a failure to meet the conditions of participation and makes the payment claims fraudulent under the FCA.

Such an argument is not a new approach to the FCA.  Other relators have argued that when the federal government sets qualifications or conditions for obtaining a government contract, certification of compliance with the conditions of participation is an implied and required condition of payment.  Under this approach, any claim for payment for a good or service that deviates from the qualifications or conditions of participation would be an actionable FCA claim.  But this circuit has held that a contractor's breach of conditions for participating in a government contract does not state a basis for FCA liability.  In *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d at 382-83, the relators claimed that language in a payment-claim form the defendants signed and submitted indicated that payment under the contract was conditioned on compliance with the conditions of participation in the contract.  The court rejected this argument, concluding that conditions of participation were not synonymous with conditions of payment.  *Id.*  Failure to comply with a condition of participation that is not also made a condition of payment is inadequate for FCA liability.  Other circuits are consistent. *See, e.g.*, *United States ex rel. Conner*, 543 F.3d 1211, 1220 (10th Cir. 2008) (holding that the sanction for violating a "[c]ondition[] of participation, as well as a provider's certification that it has complied with those conditions," is not FCA liability but rather removal from the government program,); *see also Mikes*, 274 F.3d at 701-02.   Ligai cannot base an FCA cause of action on this theory.

### 5.    Ligai's Reverse-False-Claims Cause of Action

In Count IV, Ligai alleges a "reverse false claims" cause of action under § 3729(a)(1)(G).

Ligai alleges that  the "defendants received overpayments because the payments received were

obtained through fraud and would not have been paid were the fraud known to the Government . .

. ." (Docket Entry No. 20, SAC ¶ 147).  Section 3729(a)(1)(G) makes liable whoever "knowingly

makes, uses, or causes to be made or used, a false record or statement material to an obligation to

pay or transmit money or property to the Government" or "knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or property to the

Government."  *Id.* This section provides both a false-record and fraudulent-concealment provision

applicable to reverse false claims.

In a reverse-false-claims suit, the defendant's action "does not result in improper payment

by the government to the defendant, but instead results in no payment to the government when a

payment is obligated."  *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 653 (5th

Cir. 2004).  "Reverse false claim liability" for failing to disclose and return an overpayment from

the government requires proof of the following elements:  (1) a false record is created; (2) the

provider knows the record is false; (3) the false record or statement is made, used, or caused to be

made or used; (4) to conceal, decrease, or avoid an obligation to pay the government; and (5) the

misrepresentation is material.  *See* 31 U.S.C. § 3729(a)(1)(G); *accord United States ex rel.*

*Matheny v. Medco Health Solutions, Inc.*, 671 F3d 1217, 1224 (11th Cir. 2012).

Ligai alleges that ETS knew of calibration errors, as evidenced by a technical bulletin

published in 2008 assuring customers that the calibration block had been repaired and was now

providing better results.  (Docket Entry No. 20, SAC ¶ 63).  Ligai argues that the allegation that

an Air Force officer emailed ETS to inquire about the accuracy of calibrations reported to the Air Force, to which ETS responded by making the technical improvements to their calibration instruments documented in the 2008 technical bulletin, shows that ETS knew it had been paid for noncompliant or deficient services.  (*Id.* ¶¶ 61, 65).  Ligai alleges that "ETS made no efforts to notify its customers of past calibration errors," that "prior certifications . . . were false," or to issue "a recall for these antennas." (*Id.* ¶ 64).

The Second Amended Complaint does not allege that a false record was made for the purpose of concealing "an obligation to pay money . . . to the Government," 31 U.S.C. § 3729(a)(1)(G).  Reverse-false-claims liability requires a factually sufficient allegation that a contractor knowingly created a false record or knowingly concealed overpayments obtained by fraud and not repaid.  The allegations of the Air Force officer's question and ETS's 2008 technical bulletin may support a claim that the calibration services ETS provided in exchange for payment breached its government contract, but that is insufficient for a False Claims Act cause of action, reverse or otherwise.  *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057-58 (9th Cir. 2011) ("[Relator's] allegations that [the defendant] did not comply with ATIRP's disclosure requirements, and that [the defendant] received payment from the United States pursuant to ATIRP, in essence fault [the defendant] for allegedly breaching its contractual obligations.  But 'breach of contract claims are not the same as fraudulent conduct claims, and the normal run of contractual disputes are not cognizable under the [FCA].'" (quoting and altering *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 383 (4th Cir. 2008)). He fails to allege that ETS knowingly made a false record or concealed its obligation to return payments from the government obtained by false certification when the payments were not conditioned on certification.

Ligai cannot avoid the requirement to show that certification was a condition of payment by recasting his affirmative FCA claims as reverse false claims. As prior cases have noted when similar claims have been asserted, Ligai's reverse-false claim alleges a failure to refund the false claims the government paid. In such a case, courts have held that the plaintiff "is merely recasting his false statement claim under [§ 3729(a)(1)(C)]. This type of redundant false claim is not actionable under subsection [(a)(1)(G)]." *United States ex rel. Porter v. HCA Health Services of Oklahoma, Inc.*, 3:09-cv-0992, 2011 WL 4590791, at *8 (N.D. Tex. Sept. 30, 2011); *see also United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010) ("Congress' purpose in enacting subsection [(a)(1)(G)] was to ensure that one who makes a false statement in order to avoid paying money owed the government would be equally liable under the Act as if he had submitted a false claim to receive money. Its purpose was not to provide a redundant basis to state a false statement claim under subsection [(a)(1)(B)]." (quotations and citation omitted)). And, as the court pointed out in *Porter*, the defendants "did not have an existing obligation to reimburse the monies [they] had received from [the government] because [it] has never imposed any obligation . . . to reimburse any [] payments." 2011 WL 4590791, at *8; *see also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) ("The [relators] have not identified in their complaint any concrete obligation owed to the government by [the defendant] at the time an allegedly false statement was made. Rather, they merely allege that [the defendant] is obligated to repay all payments it received from the government. Their allegations involving [§ 3729(a)(1)(G)] accordingly fail.").

**6.      Conclusion as to Ligai's § 3729(a)(1)(A), (B), & (G) Claims**

The motion to dismiss the FCA claims asserted in Counts I, II, and IV is granted.  Ligai has already amended three times.  There is no basis to infer that a fourth effort would cure the deficiencies in his claims, given the Fifth Circuit binding precedent.  Although Ligai argues that somewhere there may be contracts that, if read, may include requirements for certifications of accurate calibration as a condition of government payment, this argument is insufficient to excuse the pleading deficiency.

Ligai argues that "tracking numbers" on ETS's Certificates of Calibration Conformance, which match a "service order" number for a specific calibration, may identify a specific contract. (Docket Entry No. 46, at 10).   But he does not explain the basis for this speculation.  Indeed, as ETS points out, neither Ligai's pleading and briefs, nor the record, provide a basis to assume that there are contracts with terms conditioning payment on certifications of compliance with specific calibration standards.  Ligai attached to his complaint ETS's service orders, service order verifications, purchase orders, and invoices, but none of these documents contain such a contract term or condition.  And none of these documents show that there are more detailed government contracts between the federal contractors and ETS that only the defendants have and that Ligai cannot obtain.

To the extent Ligai argues that he lacks documents necessary to plead a legally sufficient claim and cannot obtain the information without formal discovery, his argument lacks merit. While courts may relax the Rule 9(b) standard if "the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge," *United States ex re. Russell v. Epic Healthcare Mgmt. Grp.,* 193 F.3d 304, 308 (5th Cir. 1999) (citing *Thompson,* 125 F.3d at 903), *abrogated on other grounds by United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 931 & n.1 (2009), courts do

26

not exempt a plaintiff from Rule 9(b) requirements if documents containing the information needed for pleading are in the possession of, and presumably available from, other sources.  *Id.* Such other sources include the United States government and its agencies and departments. Similarly, while courts may relax the pleading requirements under Rules 8 or 12 when documents or information necessary to plead sufficiently are solely within the defendants' possession, this does not apply when the documents or information are available to the plaintiff without the compulsion of formal discovery.  Because there is no basis to conclude that Ligai could not have obtained copies of the ETS contracts or other relevant documents from the United States government or other sources, relaxation of the pleading requirements is inappropriate.  *See United States ex rel. Rafizadeh v. Continental Common, Inc*., 553 F.3d 869, 873 (5th Cir. 2008).

The claims asserted in Counts I, II, and IV are dismissed, with prejudice and without leave to amend, because amendment would be futile.

### C.       The Conspiracy Claim

Ligai alleges "[o]n information and belief" that ETS, ESCO, and "others as yet unkown" conspired to defraud the United States by making false claims in violation of 31 U.S.C. § 3729(a)(1)(C).  (Docket Entry No. 20, SAC ¶ 142).  ETS is a subsidiary of ESCO.  In *Hilliard v. Ferguson*, 30 F.3d 649 (5th Cir. 1994), the Fifth Circuit reiterated that a "corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."  *Id.* at 653 (quotations omitted).  As a matter of law, "a parent corporation cannot conspire with its own subsidiary."  *United States ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 856 (S.D. Tex. 2003); *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 771 (1984) (observing, in the context of intracorporate conspiracy claim under the Sherman Act, that "[i]n any conspiracy, two

27

or more entities that previously pursued their own interests separately are combining to act as one for their common benefit" but "[a] parent and its wholly owned subsidiary have a complete unity of interest" because "[t]heir objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one"); *United States ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 528 & n.17 (D. Md. 2006) (applying *Copperweld* to reject intracorporate conspiracy claim under the FCA).  Ligai's remaining allegation about "other[]" "unknown" conspirators is too general and conclusory to state a claim.

This cause of action is dismissed with prejudice and without leave to amend.  The claim is legally deficient in a way that additional pleading amendment cannot cure, making amendment futile.

### D.       The Common-Law Claims

#### 1.       Payment By Mistake of Fact and Unjust Enrichment

In Counts V and VI, Ligai asserts common-law claims for payment by mistake of fact and unjust enrichment.  (Docket Entry No. 20, SAC ¶¶ 151-62).  Courts do not allow relators to assert common-law claims based on the "partial assignment" of the government's FCA claims under 31 U.S.C. § 3730(b).  *See Vermont Agency of Nat. Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000).  Although Congress allowed private litigants to sue for damages for violations of § 3729, despite the fact that the only damaged party is the government, the statute expressly authorizes assignment of only causes of action under § 3729.  *See* 31 U.S.C. § 3730(b)(1) ("A person may bring a civil action *for a violation of section 3729* for the person and for the United States Government." (emphasis added)).  There is no assignment to bring claims under the common law or other statutes, even if the claims relate to the same events.  As the court

explained in *United States ex rel. Rockefeller v. Westinghouse Elec. Co.*, 274 F.Supp.2d 10

(D.D.C. 2003), "[a] relator in a *qui tam* FCA action does not have standing to assert common law

claims based upon injury sustained by the United States."  *Id.* at 14; *see also United States ex rel.*

*Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F.Supp.2d 443, 451–52 (S.D.N.Y. 2001) (holding

that a relator lacks standing to bring common-law claims of fraud, mistake of fact, and unjust

enrichment); *United States ex rel. Walsh v. Eastman Kodak Co.,* 98 F.Supp.2d 141, 149 (D.Mass.

2000) (same).

The same result applies here.  Ligai's common-law claims are dismissed without leave to

amend because the pleading deficiency cannot be cured by further amendment.

E.       **The False Claims Act Retaliation Claims**

Both plaintiffs allege that ETS and ESCO "discharged, demoted, suspended, threatened,

harassed, and otherwise discriminated against [them] in the terms and conditions of their

employment" in retaliation for Ligai's complaints about the defendants' calibration work, in

violation of 31 U.S.C. § 3730(h).  (Docket Entry No. 20, SAC ¶ 164).  The False Claims Act's

antiretaliation provision states:

> Any employee, contractor, or agent shall be entitled to all relief
> necessary to make that employee, contractor, or agent whole, if that
> employee, contractor, or agent is discharged, demoted, suspended,
> threatened, harassed, or in any other manner discriminated against in
> the terms and conditions of employment because of lawful acts done
> by the employee, contractor, agent or associated others in
> furtherance of an action under this section or other efforts to stop 1
> or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).  The elements of an FCA retaliation claim are that: "(1) the employee

engaged in activity protected under the statute; (2) the employer knew that the employee engaged

in protected activity; and (3) the employer discriminated against the employee because she

engaged in protected activity." *United States ex rel. George v. Boston Scientific Corp.*, 864 F.Supp.2d 597, 603-04 (S.D. Tex. 2012) (quotations omitted); *accord  United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 371-72 (5th Cir. 2011) (per curiam).

To engage in protected activity under the FCA, an "employee's actions must be aimed at matters that reasonably could lead to a viable claim under the Act." *George*, 864 F. Supp.2d at 605 (citations omitted).  "The employee's actions must be aimed at matters demonstrating a 'distinct possibility' of False Claims Act litigation." *Id.* (citations omitted).  The Fifth Circuit recognizes "internal complaints that 'concern false or fraudulent claims for payment submitted to the government' as protected activity under the Act, but requires that the complaints raise concerns about fraud." *Id.* (quoting *Patton*, 418 F. App'x at 371-72); *see also Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994) (concluding that a plaintiff claiming FCA retaliation was not engaged in protected activity because his "reporting was qualitatively different" from that of successful plaintiffs who "did express concerns about possible fraud to their employers").

The Second Amended Complaint does not adequately allege protected activity–that is, conduct undertaken "in furtherance of an action" under the FCA or to stop FCA violations–or that any such activity put the defendants on notice of potential FCA liability.  Ligai argues that he engaged in protected activity and put the defendants on notice when complaining about "error" and "technical flaws" that "led to the submission of factually and legally false claims."  (Docket Entry No. 46, at 37).  An employee's allegations that he complained about his employer's errors in performing a government contract are insufficient unless the employee specifically referred to fraudulent claims for payment for those services, putting the employer on notice of potential FCA liability.  *See Patton*, 418 F. App'x at 372-73.

Ligai argues that FERA's 2009 revisions to the FCA broadened the scope of protected activity that FCA's antiretaliation provision covers to "efforts to stop 1 or more violations of" the FCA, 31 U.S.C. § 3730(h). Accepting his argument, the Second Amended Complaint still fails adequately to allege that Ligai undertook efforts to stop one or more FCA violations and that he put ETS on notice of potential FCA violations. Ligai fails to allege that he complained to ETS of fraud against the government. *See George*, 864 F. Supp.2d at 606; *Guerrero v. Total Renal Care, Inc.*, No. EP-11-cv-449-kc, 2012 WL 899228, at *5 (W.D. Tex. March 12, 2012) (observing that even after the 2009 FERA amendments, "[i]n order to constitute protected conduct, an employee's internal report must specifically allege fraudulent claims for federal funds and not merely address concerns about general misconduct"); *Layman v. MET Labs., Inc.*, No. RDB-12-2860, 2013 WL 2237689, at *6 (D. Md. May 20, 2013) (same). The Second Amended Complaint alleges that Ligai reported "standard violations and technical issues (even alleging fraud) to all levels of ETS's management," (Docket Entry No. 20, SAC ¶ 115), but complaining about "standard violations and technical issues" is not complaining of fraud. The complaint fails to provide any specific facts in support of Ligai's conclusory claim of "alleging fraud."

Perhaps recognizing this deficiency, Ligai attached an email (dated May 22, 2011) to his response in opposition to the motion to dismiss. (*See* Docket Entry No. 46, Ex. 4). The email, Ligai asserts, supports his argument that he complained to ETS that its calibration errors resulted in fraudulent statements of compliance with applicable standards to the government. (*See id.* at 38). The email is, as ETS points out, beyond what Rule 12(b)(6) or Rule 9(b) allow this court to rely on in ruling on a motion to dismiss. A complaint cannot be amended by attaching documents to a response to a motion to dismiss. *See Brown v. Aetna Life Ins. Co.*, 975 F. Supp. 2d 610, 616 (W.D. Tex. 2013) ("A party cannot amend a complaint by attaching documents to a response to a

31

motion to dismiss." (quotations omitted)); *accord Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) ("Ordinarily, we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss.").

It is unclear whether amending the complaint to include allegations of the May 2011 email will overcome the pleading deficiency.  The email sent to Richard Goodlaw and eleven others at ETS on May 21, 2011 stated as follows:

> Attached is a requested by you data comparison between 6GHz GTEM and the walk-in Chamber.  There are two spots at 4.5GHz and 5.5GHz where Chamber and GTEM substantially deviate from each other, which leaves GTEM questions open.  The rest of the frequency range looks similar both for GTEM and the Chamber. This fact raises yet another issue, which is even worse.  Is the 6000 series measured correctly at high frequency?  It looks like it's not and it's never been.
>
> To make things worse, the X and Y axes deviate 60 degrees from the geometrical zero, while the Z axis deviates only 10-15 degrees from the geometrical zero.  I checked two different probes – one is ours and another one belongs to Naval Warfare Center – with the same results.  What's interesting is that the transition between positive and negative degrees on the graph is actually very sharp – within 1MHz. Let's say, it's 20 degrees at 3780MHz and it's -40 degrees at 3781MHz.
>
> If these issues were known to you and to the previous Cal Lab Supervisors long time ago, why were they not addressed by now? Were they reported to the customers or A2LA or US government? Does it look like a technical fraud to you?  I think I re-attach the original document as I copy this e-mail up to the chain.  Reason being is that you sound like you are not going to either address or to report this issue to the upper management.  Indeed, without the support and high level of expertise it's hard or impossible to do. However, I was shocked that you or whoever backed your opinion considered those disturbing facts as a normal situation.  Well, as Bruce Butler always reminded me, I was and I am entitled to have my own opinion in our company (thanks, Bruce!).  This is great even though the integrity cost is a little bit too high over here.

(Docket Entry No. 46, Ex. 4) (emphasis removed).

32

The response from one of the addressees, Bill Giancone, a senior vice president of ETS, stated:

> In this email, you have communicated in a manner in which you've been informed not to communicate.  There was no reason to send this email to the cal team, and there is nothing in your emails to come close to a fraudulent finding so an assertion of fraud is inflammatory instead of working towards Continuous Improvement which is key in our organization. You and I have spoken on how our employees are expected to communicate and this email of yours fails on a few levels.  I'm going to ask you to have follow up meetings with myself and Melani to coach you to communicate in a proper manner.  I will  be in the Cedar Park office starting on June 1 and I will schedule the meetings.  No need for a response from you, I will schedule the meeting.

(*Id.*).

The email Ligai sent refers to "a technical fraud" from failing to address or disclose certain calibration problems to customers, A2LA, or the government.  (*Id.*).  While the response is focused on *how* Ligai communicated his criticism rather than the substance of that criticism, it acknowledges that Ligai expressed a concern about fraud.  The response told Ligai that he should not have sent the email to the "team"; that nothing in the email suggested anything that would "come close to a fraudulent finding," making his choice of words "inflammatory" instead of "working towards Continuous Improvement"; and that Ligai needed coaching on how to communicate in a proper manner.  (Docket Entry No. 46, Ex. 4).  The court cannot conclude as a matter of law that further pleading amendment as to the protected activity would be futile.

The employer must be on notice that the employee is investigating fraud that could potentially lead to FCA exposure or is trying to stop one or more violations of the FCA.  *See George*, 864 F.Supp.2d at 607 (citing *Patton*, 418 F. App'x at 372); *see also Halasa v. ITT Edu. Servs., Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012) (concluding that although the employee's

complaints to superiors about "violations of ITT's legal obligations under" its contract with the Department of Education would "permit a trier of fact to find that he engaged in [protected] 'efforts to stop' potential FCA violations" under the amended act, he failed to produce any evidence that the decisionmakers who fired him "knew of his protected conduct"). Ligai does not allege that ETS knew that he had initiated an investigation that could lead to a *qui tam* action. Instead, Ligai alleges that he concealed from ETS that he had contacted the A2LA and the FBI and that when A2LA did its audit in November 2010, the "inspectors did not want to reveal to ETS that they had received prior knowledge of the inspected items from Relator who, at the time of the A2LA Audit, remained employed at ETS." (Docket Entry No. 20, SAC ¶ 44). But the employer need not know that the employee has filed or is contemplating filing an FCA action; it is enough that the employer knows that the employee was engaged in protected activity that concerns potentially false or fraudulent claims that reasonably could lead to such an action. *See George*, 889 F.Supp. 2d at 607. If the employer has no basis to believe that the employee is investigating fraud or trying to stop an FCA violation, there is no basis to infer the employer's knowledge of the employee's allegedly protected activity. *See id.*; *Halasa*, 690 F.3d at 848.

Ligai was fired several months before the complaint was unsealed. The Second Amended Complaint does not allege facts that would show that ETS knew that Ligai was himself investigating potential fraud or had initiated an external investigation into such matters the decision to fire him was made. But given the May 2011 email, the court cannot find that, as a matter of law, amending this claim would be futile.

Although the court's dismissal of the retaliation claims is without prejudice and with leave to amend, a cautionary note is in order. The temporal gap between the May 2011 email Ligai focuses on in  his brief and ETS's decisions to discharge him and his wife weighs heavily against

finding a causal link between his complaints and the adverse employment decisions.  The email Ligai emphasizes is dated May 2011.  Tatiana Ligai's demotion occurred three years earlier, in 2008, and cannot be linked to the 2011 email.[11]  Tatiana Ligai was fired in May 2012, a year after Slav Ligai sent the email.  The 12-month gap between the email that Ligai contends shows that his internal complaints were not limited to complaints of errors but extended to concerns about fraud, and ETS's decision to fire Tatiana Ligai weakens any inference that the decision was in retaliation for Ligai's internal complaint.  *See Foster v. Solvay Pharm., Inc.*, 160 F. App'x 385, 389 (5th Cir. 2005) ("Foster was fired in May 2003, six months after filing this action and nearly a year after filing his EEOC complaint.  Contrary to Foster's contention, this time gap is too great to establish retaliation based merely on temporal proximity."); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002) (concluding, in a Title VII case, that a five-month period does not make a prima facie showing of retaliation); *see also E.E.O.C. v. Prod. Fabricators, Inc.*, No. 13-2102, — F.3d — ,2014 WL 3971477 (8th Cir. Aug. 15, 2014) ("Given that Breaux engaged in the protected activity a year prior to his termination, the temporal connection here does not support a finding of causation."); *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C. Cir. 2007) ("Although causation can sometimes be inferred by temporal proximity, the eight- or

---

[11] Any retaliation claim based on Tatiana Ligai's 2008 demotion is also time-barred.  The Second Amended Complaint, which added Tatiana Ligai as a plaintiff and was not filed until July 23, 2013, alleges that "[i]n May 2008, Slav Ligai continued to report calibration problems within ETS's Calibration Laboratory and Tatiana was, without justification, demoted and sent back to the Electronics Department."  (Docket Entry No. 20, SAC ¶ 10).  The Dodd-Frank Wall Street Reform & Consumer Protection Act, Pub.L. No. 111–203, § 1079A, 124 Stat. 1376, 2079 (2010), created a three-year statute of limitations for FCA retaliation claims when it took effect on July 22, 2010.  For an FCA retaliation claim accruing before Dodd-Frank's effective date, however, the statute of limitations in Texas is two years.  *See Riddle v. Dyncorp Int'l, Inc.*, 666 F.3d 940, 943 (5th Cir. 2012).  This two-year statute of limitations expired on Tatiana Ligai's May 2008 retaliatory demotion claim two months before Dodd-Frank took effect in July 2010.  Tatiana Ligai did not bring her first retaliation claim until the Second Amended Complaint was filed on July 23, 2013, five years after she was demoted.  She cannot revive a claim that expired before the Dodd-Frank Act's three-year statute of limitations became effective.

nine-month gap between the final protected activity–either the physician's March 2000 letter or

Mayers's April 2000 conversation with the Assistant Executive Director–and the early January

2001 project is far too long."); *Figueroa v. Weisenfreund*, 255 F. App'x 595, 596-97 (2d Cir.

2007) (concluding that a 12- to 15-month gap between the protected activity and the adverse action

was "too long to establish the required causal connection sufficient to support a § 1983 claim").

Even considering the May 2011 email, the fact that a full year passed before Tatiana Ligai was

fired may weigh against finding a prima facie showing of retaliation.

The 21-month gap between the May 2011 email and Ligai's own firing in February 2013 is

even more problematic.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action

taken (as here) 20 months later suggests, by itself, no causality at all."); *Raggs*, 278 F.3d at 472

(five months); *Mayberry v. Mundy Contract Maint. Inc.*, 197 F. App'x 314, 317 (5th Cir. 2006)

(two-year lapse between protected activity and termination was "too long to establish causation"

(citing *Breeden*, 532 U.S. at 273)).

Both Slav Ligai's and Tatiana Ligai's retaliation claims are dismissed, but without

prejudice and with leave to amend.  Any amended claim must be filed by October 17, 2014.

**F.      The Claims Against ESCO**

ESCO moved to dismiss the claims against it on the additional basis that nothing in the

Second Amended Complaint supports the claims against ESCO, ETS's parent company.  ESCO

correctly argues that this parent-subsidiary relationship is insufficient to state a claim that ESCO

was Slav or Tatiana Ligai's employer or was involved in the decisions they challenge.  Ligai's

arguments are based on speculating that ESCO (as opposed to or in addition to ETS) contracted

with the government are simply insufficient either to amend the pleading or to provide any basis to

conclude that an amendment would be anything but futile.

Nor do the allegations in the Second Amended Complaint about ESCO or the arguments in Ligai's briefs in opposition to the motion to dismiss present any basis to pierce the corporate veil separating ETS and ESCO, or to make an integrated-enterprise theory of liability applicable, or to find that ESCO, as opposed to or in addition to ETS, employed Tatiana or Slav Ligai.  The argument that Slav Ligai emailed some of his complaints to an ESCO officer does not raise any inference that ESCO was involved in the calibration work, the certifications of that work, or in the decisions to terminate the Ligais' employment.

The claims against ESCO are dismissed, with prejudice and without leave to amend because amendment would be futile.

## IV.    Conclusion

The defendants' motions to dismiss the Second Amended Complaint are granted.  Counts I and II, asserting claims under False Claims Act, 31 U.S.C. § 3729(a)(1)(A) & (B); Count III, asserting claims for conspiracy under 31 U.S.C. § 3729(a)(1)(C); Count IV, asserting reverse false claims under 31 U.S.C § 3729(a)(1)(G); and Counts V and VI, asserting common-law claims,  are dismissed, with prejudice and without leave to amend.  Count VII, asserting retaliation under 31 U.S.C. § 3730(h), is dismissed without prejudice and with leave to amend.  Any amended complaint asserting retaliation must be filed by October 17, 2014.

SIGNED on September 16, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge